IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARYLAND CASUALTY COMPANY,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.

No. C 05-02558 JSW

**ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Now before the Court is the motion by defendant United States of America ("Defendant") for judgment on the pleadings against plaintiff Maryland Casualty Company ("Plaintiff"). Having carefully reviewed the parties' papers, considered their arguments and the relevant legal authority, and good cause appearing, the Court HEREBY GRANTS Defendant's motion for judgment on the pleadings.

**BACKGROUND**

On September 7, 2000, Defendant entered into a contract with Agbayani Construction Corp. ("Agbayani") to have a parking lot paved at the Coast Guard Training Facility in Petaluma, California. (Br. at 3.) The contract gave Agbayani the responsibility of locating all underground utilities in the excavation area. (Compl., Exh. B at 1.09; 3.01A.) Agbayani was also required to mark utilities and to give one-week notice before trenching. (Compl., Exh. B at 1.13.) The contract also gave Agbayani responsibility for complying with "any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work," including the standards issued by the Secretary of Labor at 29 CFR § 1926 and 29 CFR

1  § 1910. (Declaration of Katherine B. Dowling ("Dowling Decl.") at 3: 8-10, 4: 16-20.) Under

2  the contract, only the Contracting Officer and the Contracting Officer's Representative/Contract

3  Program Manager had the power to stop or waive performance of the contract. (Compl., Exh. B

4  at E.3, G.1; Dowling Decl. at 4: 28, 5: 1-9.) In May 2003, Gerald D. Ryan served as the

5  Contract Program Manager for the contract between Agbayani and Defendant. (Declaration of

6  Gerald D. Ryan ("Ryan Decl.") at ¶ 1.)

7  Defendant provided Specifications to Agbayani along with drawings indicating the

8  approximate location of underground utilities. (*Id.* at ¶¶ 3-4 and Attachments.) These drawings

9  were also available to Agbayani and its subcontractors in the Facilities Engineering Office of

10  the Training Center. (*Id.* at ¶ 4.) The Specifications warned Agbayani that the drawings only

11  showed approximate locations, that Agbayani had the duty to "compare drawings and verify the

12  dimensions and conditions at the site before laying out the work," and that Agbayani had the

13  responsibility to comply with hazard communication requirements and to locate underground

14  utilities. (Compl., Exh. C at 1.13A, 1.14, 1.26, 3.01A.)

15  Agbayani hired a subcontractor, Goeble Paving, Grading and Underground ("Goeble"),

16  to perform the work for Defendant. (Opp. Br. at 1-2.) Goeble then subcontracted with J & A

17  Jeffrey Inc. dba Western Stabilization ("J & A") to perform soil treatment at the project site.

18  (Compl. at ¶ 8.) On May 30, 2003, Goeble asked Defendant's Maintenance Supervisor, Fred

19  Heminger ("Heminger"), if there were any utilities in the area where they would be working.

20  (Declaration of Thomas G. Dunn ("Dunn Decl.") at ¶ 3.) Heminger "replied that the only

21  utilities in the area where the subcontractors would be mixing and working were high voltage,

22  storm drain, culverts and water lines." (*Id.*) Later that day, J & A's soil pulverizer was

23  destroyed when it hit an underground gas utility line. (Compl. at ¶ 10.)

24  On January 22, 2005, Plaintiff, as the subrogee of J & A, commenced the current action.

25  In its complaint, Plaintiff alleged that Defendant was negligent for failing to place signs,

26  placards, or stakes warning of the presence of underground propane pipelines; that Heminger

27  was negligent by informing the subcontractor that there were no underground pipelines in the

28  designated parking lot area; and that Defendant was negligent by failing to provide the

2

subcontractors with "an updated plan or map depicting the location of all underground lines in the vicinity of the planned excavation." (Compl. at ¶¶ 15, 16, 17.)

## ANALYSIS

**A.      Legal Standard Applicable to Motion for Judgment on the Pleadings.**

The defense of lack of subject mater jurisdiction cannot be waived, and the court is under a continuing duty to dismiss an action whenever it appears that the court lacks jurisdiction. Fed. R. Civ. P. 12(h)(3). When a defendant moves to dismiss a complaint or claim for lack of subject matter jurisdiction, the plaintiff bears the burden of proving that the court has jurisdiction to decide the claim. *Thornhill Pub'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979). Rule 12(b)(1) jurisdictional attacks can be either facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a factual attack, "the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.* In reviewing a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment. *Id.* "If the moving party converts 'the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction.'" *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004) (citing *Meyer*, 373 F.3d at 1039). In a factual attack, "[n]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional claims." *Thornhill*, 594 F.2d at 733. Here, Plaintiff does not dispute that Defendant's motion is a factual attack on subject matter jurisdiction. Defendant relies on extrinsic evidence and does not assert a lack of jurisdiction based solely on the pleadings.

3

**B.      Plaintiff's Complaint Is Barred by the Discretionary Function Exception.**

   **1.      Two-Part Test Applicable to Discretionary Function Exception.**

Defendant moves for judgment on the pleadings based on the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a) ("FTCA").  According to Defendant, the discretionary function exception applies and thus deprives the Court of jurisdiction to hear this case.

The FTCA waives governmental immunity from suits for negligence.  28 U.S.C. § 2680(a); *see also Chaffin v. United States*, 176 U.S. 1208, 1211 (9th Cir. 1999).  However, the FCTA does not waive immunity when the government is performing a "discretionary function." *Miller v. United States*, 163 F.3d 591, 593 (9th Cir. 1998).  The discretionary function immunizes the government from claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government whether or not the discretion involved be abused."  28 U.S.C. § 2680(a); *see also Miller*, 163 F.3d at 593.

Courts use a two-part test to determine if the discretionary function exception applies. *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1173 (9th Cir. 2002).  First, "the challenged conduct must be discretionary – that is, it must involve an element of judgment or choice." *Id*. "This requirement is not satisfied where a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because '[i]n this event, the employee has no rightful option but to adhere to the directive.'"  *Id*. at 1173-74 (citing *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).

Second, if "the conduct involves choice or discretion, the court must then 'determine whether that judgment is of the kind that the discretionary function exception was designed to shield.'" *Id.* at 1174 (citing *Berkovitz*, 486 U.S. at 536).  "The focus is on 'the nature of the actions taken and on whether they are susceptible to a policy analysis.'" *Id.* (citing *United States v. Gaubert*, 499 U.S. 315, 325 (1991)).  "The decision need not *actually* be grounded in policy consideration so long as it is, by its nature, *susceptible* to a policy analysis." *Miller*, 163 F.3d at 593 (citing *Gaubert*, 499 U.S. at 325) (emphasis added).  When a statute or regulation

4

1  allows a federal employee to act with discretion, "it must be presumed that the agent's acts are
2  grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324.  Although the
3  plaintiff bears the burden of proving that the court has jurisdiction, the government bears the
4  burden of demonstrating the discretionary function exception applies.  *Miller,* 163 F.3d at 594.
5  If the discretionary function exception applies, governmental decisions are immune from
6  liability, even if such decisions were negligently made.  *Chaffin*, 176 F.3d at 1211.

### 2. Defendant's Acts Involved Choice or Discretion.

8  Plaintiff contends that Coast Guard safety regulations required its officers to inform all
9  contract employers of the known potential fire, explosion, or toxic release hazards related to the
10 contractor's work.  (Opp. Br. at 5-9.)  Plaintiff argues that Defendant had a duty to place
11 warning signs, placards, or stakes to mark underground utilities.  (Opp. Br. at 4-8.)  Defendant
12 argues that its conduct is protected by the discretionary function exception.  (Br. at 6-12.)

13 Under the first prong of the discretionary function test, the challenged conduct must
14 involve an element of judgment or choice.  *GATX/Airlog Co.*, 286 F.3d at 1173.  "This
15 requirement is not satisfied where a 'federal statute, regulation, or policy specifically prescribes
16 a course of action for an employee to follow.'"  *Id.* at 1173-74 (citing *Berkovitz*, 486 U.S. at
17 536).  However, a general regulation or policy does not remove discretion unless it specifically
18 prescribes a course of conduct.  *Kelly v. United States*, 241 F.3d 755, 761 (9th Cir. 2001).  A
19 safety standard operates to remove discretion under the first prong of the discretionary function
20 test only when such standard "is embodied in a *specific* and *mandatory* regulation or statute
21 which creates clear duties incumbent upon the governmental actors."  *Kennewick Irrigation
22 Dist. v. United States*, 880 F.2d 1018, 1026 (9th Cir. 1989) (emphasis in original).  General
23 duties to promote safety are insufficient to erase any discretion.  *Id.*; *see also Blackburn v.
24 United States*, 100 F.3d 1426, 1433 (9th Cir. 1996) (holding that guidelines and regulations only
25 set out general goals and policies regarding identifying and warning of hazards and thus
26 necessarily involved discretion in determining the precise manner in which to meet such goals
27 and policies).

1    Here, Plaintiff cites to various sections of the Coast Guard Safety and Environmental
2    Health Manual ("Manual") in support of its contention that Defendant had a duty to warn
3    Agbayani of underground gas lines. (Opp. Br. at 5.) Plaintiff points, for example, to the Coast
4    Guard's "fundamental safety and environmental health principle," as stated in the Manual, of
5    continually managing "the safety and environmental health risks confronting Coast Guard
6    personnel in their professional and private lives to acceptable levels and never to accept
7    unnecessary risks." (Dunn Decl., Exh. E at 1-1.) "This principle will be applied by identifying
8    hazards, assessing their risk and controlling risks to acceptable levels, consistent with the
9    mission or activity being performed." (*Id.*) The Manual further states that "[a]lthough
10   contractors are primarily responsible for providing safe working conditions for their employees
11   and ensuring compliance with OSHA regulations, the Coast Guard has overall administrative
12   responsibility for its facilities and is responsible . . . to take reasonable steps to correct, or to
13   require the correction of, hazards of which it could reasonably be expected to be aware." (*Id.* at
14   1-2.) The principles set forth in the Manual are not specific or mandatory enough to erase any
15   discretion. *See Kennewick*, 880 F.2d at 1026. Although Defendant retained the ability to
16   supervise, no statute, regulation, or policy imposed any specific, mandatory requirements or
17   regulated the manner in which the supervision must be carried out. The Manual provides only
18   that the Coast Guard will assess and control risks to acceptable levels. The means by which
19   Defendant met its general policy goals involved the exercise of discretion. Any alleged
20   government failure to properly supervise Agbayani's exploration of underground utilities is a
21   discretionary function. Absent a specific and mandatory obligation to warn Agbayani of site
22   incidents or accidents, Defendant had discretion as to whether and how to warn Agbayani of all
23   known risks or dangers.

24   Plaintiff also cites to Commandant Instruction 6260.21B, which states that "Coast Guard
25   units will provide MSDS [Material Safety Data Sheet] information to contractors whose
26   employees perform work activities within unit facilities if hazardous materials are provided by
27   the Coast Guard. Information provided shall be sufficient to enable contractors to satisfy their
28   hazardous communication responsibilities." (Dunn Decl., Exh. F.) This instruction does not

6

present a specific and mandatory obligation as to how Defendant must warn of the location of underground utilities. Defendant acted within its discretion by providing Specifications and drawings to Agbayani and by placing the responsibility on Agbayani to comply with hazard communication requirements. (Compl., Exh. C at 1.14, 1.26; Ryan Decl. at ¶ 3-5.)

Plaintiff next cites to the Code of Federal Regulations which requires the employer to inform "contract employers of the known potential fire, explosion, or toxic release hazards related to the contractor's work and the process." 29 CFR § 1926.64(h)(2)(ii); 29 CFR § 1910.119(h)(2)(ii). This regulation, however, does not state specifically how the employer must inform contract employers of the known hazards or how detailed such information must be. Therefore, the employer retains discretion to decide exactly what information must be provided to the contract employer. The Court finds that Defendant acted within the scope of its discretion by informing Agbayani of the known utilities by providing maps, warning Agbayani that those maps were only approximations, and explicitly giving Agbayani the responsibility of determining the precise location of the utilities. (Compl., Exh. B. at 1.09; Compl., Exh. C at 1.13-1.14; Dowling Decl. at 2: 2-18; Ryan Decl. at ¶¶ 4-6.)

Even assuming Defendant did have a duty to mark underground utilities, the contract between Agbayani and Defendant clearly delegated that duty as well as the duty to comply with safety regulations to Agbayani.[1] Plaintiff does not cite to any applicable statutes or regulations prohibiting Defendant from exercising its discretion to delegate the duty to locate and mark underground utilities. In addition, "[t]he law is clear that the government may delegate its safety responsibilities to independent contractors in the absence of federal laws or policies restricting it from doing so." *Andrews v. United States*, 121 F.3d 1430, 1440 (11th Cir. 1997);

---

[1] The contract between Agbayani and Defendant required Agbayani to "field verify all utility locations before digging or trenching. This shall include but not be limited to the use of sonic, electronic or magnetic detection devices, by noting pullbox and utility box locations at the surface, and by potholing." (Compl., Exh. B at 1.09.) Agbayani was also required to give one-week notice before trenching and mark utilities. (Compl., Exh. B at 1.13.) In addition, the contract stated that "[i]n the event underground utilities exist in the area of excavation, the contractor will be responsible for the location of such utilities." (Compl., Exh. B at 3.01A.) Finally, the contract also gave Agbayani responsibility for complying with "any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work," including the standards issued by the Secretary of Labor at 29 CFR § 1926 and 29 CFR § 1910. (Dowling Decl. at 3: 8-10, 4: 16-20.)

7

*see also United States v. S.A. Empressa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 820 (1984); *Vallier v. Jet Propulsion Lab.*, 120 F. Supp. 2d 887, 913 (C.D. Cal. 2000).

Plaintiff cites to *Camozzi v. United States*, 866 F.2d 287 (9th Cir. 1989), in support of its contention that the discretionary function does not apply. (Opp. Br. at 9.) In *Camozzi*, the United States Postal Service ("USPS") contracted with a contractor to supervise the construction of a postal facility. *Id.* at 288. The court held that USPS was negligent in performing its retained safety functions and that such negligence involved no policy choices. *Id.* at 290. However, in *Camozzi*, the USPS, through its contractor, assumed far greater contractual obligations with respect to overall safety than did Defendant in this case. *Id.* at 289. Here, Defendant did not assume any specific contractual obligations with regard to safety. Rather, the contract gave Defendant broad discretion in determining how it would police Agbayani's (or its subcontractors') compliance. Unlike the contract in *Camozzi*, the contract at issue here did not prescribe specific and mandatory activities and oversight mechanisms with which Defendant was required to comply. Accordingly, *Camozzi* does not support Plaintiff's contention that Defendant's conduct is not protected by the discretionary function exception. Plaintiff fails to point to any regulation, statute, or self-imposed specific and mandatory obligation on the part of Defendant to oversee safety in a particular manner. Accordingly, the first prong of the discretionary function analysis is met.

Although Defendant's decisions regarding the warnings provided to Agbayani, the extent of its supervision of Agbayani, and the delegation of authority to Agbayani are discretionary functions, the issue remains as to whether Heminger's actions also fall within that category. Plaintiff does not argue that the Contracting Officer or the Contract Program Manager failed to warn Agbayani or its subcontractors of the underground gas pipe; rather, Plaintiff argues that Heminger, failed to warn them of the pipe. (Compl. at ¶ 16.) The alleged negligence of Heminger is irrelevant to the discretionary function inquiry. *See Kennewick*, 880 F.2d at 1029. The relevant inquiry is whether Heminger exercised a discretionary function. "[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the

8

discretionary function exception applies in a given case." *Varig Airlines*, 467 U.S. at 813. A court must consider whether the action is a matter of choice for the acting employee. *Berkovitz*, 486 U.S. at 536. "[I]f the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect." *Id.* The discretionary function exception "will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Id*.

Here, again, Plaintiff has not identified, in the papers submitted to the Court or at oral argument, a specific statute, regulation, or policy which specifically prescribes a course of action for an employee like Heminger to follow. In addition, the evidence before the Court suggests that Heminger had discretion in the manner in which he responded to the subcontractor's inquiry on May 30, 2003. Under the contract, only the Contracting Officer and the Contracting Officer's Representative/Contract Program Manager had the ability to stop work on any portion of the job. (Compl., Exh. B at E.3, G.1; Dowling Decl. at 4: 28, 5: 1-9; Ryan Decl. at ¶ 7.) Although Heminger did not have any authority to modify the Agbayani Contract, or to waive performance by Agbayani of the responsibility to perform tests and bear the expense to locate and mark underground utilities prior to conducting any excavation (*see* Reply Br. at 3; Ryan Decl. at ¶ 7), Heminger did, as Facilities Engineer Karl Grams noted, have "authority to exercise discretion with respect to issuing dig permits for construction and maintenance work to protect Coast Guard personnel and property." (Declaration of Karl Grams ("Grams Decl") at ¶ 3.) A dig permit was not required under the Agbayani contract; rather, the decision whether a dig permit was required and whether to issue a dig permit fell within Heminger's discretion. (*Id.*) The only supervisory obligation that existed on Heminger's part fell within the general Coast Guard's "administrative responsibility for its facilities" and its responsibility "to take reasonable steps to correct, or to require the correction of, hazards of which it could reasonably be expected to be aware." (Dunn Decl., Exh. E at 1-2.) Such a broadly phrased obligation allowed Coast Guard employees like Heminger substantial discretion in deciding how to act. Plaintiff's failure to cite an applicable mandatory directive

9

establishes that the challenged actions of Heminger involved judgment or choice and were, in fact, discretionary acts.

**3. Defendant's Judgments Were of the Kind the Discretionary Function Exception Was Designed to Shield.**

The second prong of the test to determine applicability of the discretionary function exception is whether Defendant's decision to delegate and its decision regarding its level of supervision of Agbayani are of the nature and quality Congress intended to shield from liability. "There must be reasonable support in the record for a court to find, without imposing its own conjecture, that a decision was policy-based or susceptible to policy analysis." *Marlys Bear Med. v. United States*, 241 F.3d 1208, 1216 (9th Cir. 2001). In general, "[w]hen an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind." *Varig Airlines*, 467 U.S. at 819-20 (1984). In addition, as previously stated, the law is "clear that the government may delegate its safety responsibilities to independent contractors in the absence of federal laws or policies restricting it from doing so." *Andrews*, 121 F.3d at 1440. "When established governmental policy . . . allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324. In determining whether a decision is susceptible to policy analysis, the decision could involve balancing interests, allocating resources, and setting priorities. *Varig Airlines*, 467 U.S. at 820.

Here, Defendant's decision to delegate responsibility to Agbayani for locating the underground utilities and its decision regarding the level of supervision applied to Agbayani are susceptible to policy analysis. Such decisions require Defendant "to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding." *Varig Airlines*, 467 U.S. at 820. "In light of such practical considerations, an agency may determine that operational safety will be enhanced through reliance on the contractor's special expertise." *Hagy v. United States*, 976 F. Supp. 1373, 1379 (W.D. Wash. 1997) (decision to delegate safety and warning

10

1    responsibilities to contractor is the type of policy decision the discretionary function exception
2    was designed to shield); *see also Duff v. United States*, 999 F.2d 1280, 1281-82 (8th Cir. 1993)
3    (decision to delegate safety issues to contractor grounded in policy because the decision
4    allowed the government to "take advantage of a contractor's special expertise, thereby creating
5    the opportunity for a safer, more efficient operation").  As Michael Valerio, the Chief of the
6    Maintenance and Logistics Command for the Coast Guard, stated in his declaration, the
7    decision to delegate "is a policy choice that involves the balancing of social needs for
8    workplace safety, economic constraints of available governmental resources, political
9    considerations of utilizing outside specialists and providing business to minority owned
10   companies and the cos[t] benefit analysis of numerous projects requiring funding."
11   (Declaration of Michael ("Valerio Decl.") at ¶ 2.)  Furthermore, according to Valerio, hiring
12   independent contractors "with experience in the type of work to be accomplished helps to
13   increase workplace safety, to efficiently utilize available project funding and in certain
14   situations to allow the [United States Coast Guard] to foster minority owned business."  (*Id.* at ¶
15   3.)  Such weighing of practical and policy considerations represents the kind of policy judgment
16   that Congress intended to protect through the discretionary function exception to the FTCA.
17        As for Heminger, even if his acts were discretionary, the Court must also determine
18   whether they were the product of a policy judgment.  *Berkovitz*, 486 U.S. at 536.  "It is
19   insufficient '[f]or the government to show merely that some choice was involved in the
20   decision-making process . . . .  The balancing of policy considerations is a necessary
21   prerequisite.'"  *ARA Leisure Servs. v. United States*, 831 F.2d 193, 195 (9th Cir. 1987) (citing
22   *Drake Towing Co., Inc. v. Meisner Marine Constr.*, 765 F.2d 1060, 1064 (11th Cir. 1985)).  In
23   *Varig Airlines*, the Supreme Court held that "the acts of FAA employees in executing a spot-
24   check program in accordance with agency directives [were] protected by the discretionary
25   function exception" because these employees "were specifically empowered to make policy
26   judgments regarding the degree of confidence that might reasonably be placed in a given
27   manufacturer, the need to maximize compliance with FAA regulations, and the efficient
28   allocation of agency resources."  467 U.S. at 820.

11

Here, evidence before the Court indicates that Heminger's actions in response to the subcontractor's inquiry on May 30, 2003 are susceptible to policy analysis. As Grams stated, Heminger created the dig permit process "as a means of increasing overall safety at the Training Center" and "was authorized to use his discretion to decide whether a dig permit was necessary for each case." (Grams Decl. at ¶¶ 3, 4.) Therefore, the evidence indicates that Heminger was empowered to make policy judgments regarding the need for and issuance of a dig permit. The Court concludes that Heminger's actions are susceptible to a policy analysis and that the second part of the discretionary function exception is satisfied. The application of the discretionary function exception is an independently sufficient reason to grant Defendant's motion for judgment on the pleadings.

**C.     Under the Independent Contractor Exception to the FTCA, Defendant Is Not Vicariously Liable for the Negligent Conduct of Its Independent Contractor.**

Defendant contends that the Court lacks subject matter jurisdiction because Plaintiff's claims are barred by the independent contractor exception to the FTCA. The FTCA "is a limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." *United States v. Orleans*, 425 U.S. 807, 813 (1976). The FTCA defines Government employees to include "officers or employees of any federal agency." 28 U.S.C. § 2671. The term "federal agency" explicitly excludes "any contractor with the United States." *Id*. "The United States is subject to liability for the negligence of an independent contractor only if it can be shown that the government had authority to control the detailed physical performance of the contractor and exercised substantial supervision over its day-to-day activities." *Laurence v. Dep't of the Navy*, 59 F.3d 112, 113 (9th Cir. 1995).

In order to determine whether Agbayani was a government employee, rather than an independent contractor, the Court must inquire whether Defendant possessed and exercised substantial day-to-day control over Agbayani. The Court finds that the United States did not exercise day-to-day control over Agbayani's operations. Although Defendant had the responsibility to require correction of hazards and the Contracting Officer's

12

Representative/Contract Program Manager retained the power to "stop work on any portion of the job," it appears that Defendant and the Contract Program Manager did not exercise substantial day-to-day control over Agbayani. (Dunn Decl., Exh. E at 1-2; Compl., Exh. B at E.3.) As discussed in Part B, Defendant delegated significant responsibility to Agbayani, including locating and marking underground utilities and complying with OSHA regulations. Accordingly, Defendant is not vicariously liable for the conduct of Agbayani. The application of the independent contractor exception is an independently sufficient reason to grant Defendant's motion for judgment on the pleadings.

### D.  Plaintiff's Claims Regarding Heminger's Representations Is Barred by the Misrepresentation Exception to the FTCA.

Plaintiff alleges that Heminger was negligent by informing the subcontractors that there were no underground pipelines in the paving area. (Compl. at ¶ 16.) Defendant contends that Plaintiff is actually attempting to state a claim for misrepresentation and that this claim is therefore barred by the misrepresentation exception to the FTCA. (Br. at 15-16.)

The United States is immune under 28 U.S.C. § 2680(h) from "[a]ny claim arising out of . . . misrepresentation," whether negligent or willful. *Mount Homes, Inc. v. United States*, 912 F.2d 352, 354 (9th Cir. 1990). The misrepresentation exception is broadly construed. *Frigard v. United States*, 862 F.2d 201, 202 (9th Cir. 1988). The court "must look beyond the characterizations in the pleadings to distinguish misrepresentation from negligence claims, a task which is frequently far from simple." *Rich Prods. Corp. v. United States*, 804 F. Supp. 1270, 1272 (E.D. Cal. 1992).

The Supreme Court has provided guidance in distinguishing misrepresentation from negligence claims in the context of 2680(h) immunity claims. *United States v. Neustadt*, 366 U.S. 696 (1961); *Block v. Neal*, 460 U.S. 289 (1983).[2] In *Neustadt*, the plaintiffs relied on an

---

[2] In *Guild v. United States*, a case preceding *Block*, "the Ninth Circuit expressed the sometimes elusive distinction between negligent misrepresentation and other negligence involving communication of information." *Rich Prods*., 804 F. Supp. at 1273 (citing *Guild*, 685 F.2d 324, 325 (9th Cir. 1982)). Noting that "the key distinction is between the performance of operational tasks and the communication of information," the court in *Guild* held that the "government is liable for injuries resulting from negligence in performance of operational tasks even though misrepresentations are collaterally involved." *Guild*, 685 F.2d

inaccurate written appraisal prepared by the Federal Housing Administration ("FHA"). *Neustadt*, 366 U.S. at 697-98. The Court held that the plaintiff's claim against the FHA based on this reliance was barred by the misrepresentation exception. *Id.* at 710-11. The Court defined negligent misrepresentation as breach of "the duty to use care in obtaining and communicating information upon which that party may reasonably be expected to rely in the conduct of his economic affairs." *Id.* at 706. Subsequently, the Court distinguished the duty to obtain and communicate accurate information from the duty to perform a separate task. *Block*, 460 U.S. 289 (1983). In *Block*, the plaintiff received a loan from the Farmers Home Administration ("FmHA") to build her home. *Id.* at 291. The loan agreement required that FmHA approve all plans and gave FmHA the right to inspect and test all materials and workmanship. *Id.* After discovering that the completed house was defective, the plaintiff sued FmHA alleging that it had failed properly to inspect and supervise construction. *Id.* at 297. The Court held that FmHA was subject to suit for allegedly breaching a *separate* duty to supervise the construction of the plaintiff's home, independent of its duty carefully to obtain and communicate information. *Id.* at 297. The *Block* Court distinguished *Neustadt* because the plaintiffs in *Neustadt* had alleged no injury that they would have suffered independent of their reliance on the negligent appraisal. *Id.* By contrast, the FmHA's misrepresentations in *Block* were not essential to a claim of negligent supervision. *Id.* The Court held that FmHA's "duty to use due care to ensure that the builder adhere to previously approved plans and cure all defects before completing construction [was] distinct from any duty to use due care in communicating information" to the plaintiff. *Id.* The Court concluded that the claim in *Block* was not barred by the misrepresentation exception. *Id*.

Therefore, in determining whether a complaint is barred by the misrepresentation exception, the court must look beyond the language in which the complaint is couched and consider the "essence" or "gravamen" of the suit. *Rich Prods.*, 804 F. Supp. at 1273 (citing *Mount Homes, Inc.*, 912 F.2d at 355). "[I]f the alleged misrepresentation is essential to the

---

at 325. However, the government "is not liable . . . for injuries resulting from commercial decisions made in reliance on government misrepresentations." *Id.*

14

1  claim then the action is barred even though there is some other allied negligence by the
2  government, for example, in gathering the information that proves inaccurate." *Id.* "When
3  government misinformation is at issue, [the] plaintiff must allege injury independent of that
4  caused by the erroneous information." *Id.* (citing *Mount Homes, Inc.* 912 F.2d at 356). The
5  misrepresentation exception "particularly protects the United States from suit by commercial
6  entities which claim to have lost money because of reliance on false government information."
7  *Id.*

8  To state a claim of negligence rather than misrepresentation, a plaintiff must eliminate
9  the government's communication of inaccurate information from the essence of its claim. *See*
10 *id.* Here, although Plaintiff now attempts to couch its complaint in terms of Heminger's
11 negligent performance of operational tasks, "we look beyond [Plaintiff's] characterization to the
12 conduct on which the claim is based." *See Mount Homes, Inc.*, 912 F.2d. at 356. Plaintiff
13 alleges that Heminger "was negligent by informing subcontractors . . . that there were not
14 underground pipelines" in the paving area. (Compl. at ¶ 16.) The communication of inaccurate
15 information therefore lies at the heart of Plaintiff's claim. The essence of the action is not based
16 on negligent performance of a task separate from an alleged duty to obtain and communicate
17 information. Under the reasoning in *Neustadt*, any allied negligence in gathering the
18 information communicated by Heminger does not alter that the essence of the action is
19 misrepresentation. In addition, since government misinformation is at issue, Plaintiff must yet
20 fails to allege injury independent of that caused by the erroneous information. *See Rich Prods.*,
21 804 F. Supp. at 1273 (citing *Mount. Homes, Inc.* 912 F.2d at 356). Moreover, "the claim is
22 within the heart of the area covered by the misrepresentation exception: a commercial entity
23 claiming loss because of reliance on government representations." *Id.* Therefore, any claim
24 based on the inaccuracy of information communicated by Heminger is barred by the
25 misrepresentation exception.

26 **E.     Plaintiff Has No Right to a Jury Trial.**

27 Although the Court concludes that it lacks subject matter jurisdiction over this case, the
28 Court considers Defendant's final argument attacking Plaintiff's request for a jury trial.

15

Defendant contends that Plaintiff is not entitled to a jury trial, which Plaintiff demanded in its complaint. (Br. at 17; *see* Compl. at 1.) Pursuant to 28 U.S.C. § 2402, "any action against the United States under section 1346 shall be tried by the court without a jury, except that any action . . . under section 1346(a)(1) shall . . . be tried by the court with a jury" at the request of either party. Because the claims against Defendant here are governed by the Federal Tort Claims Act, Plaintiff has no right to a jury trial.

## CONCLUSION

The Court HEREBY GRANTS Defendant's motion for judgment on the pleadings. Plaintiff's claims are barred by the discretionary function exception, the independent contractor exception, and the intentional tort exception to the FTCA. A judgment shall follow.

**IT IS SO ORDERED.**

Dated: March 6, 2006

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE